**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL JANESKI,** | : | |
| **Petitioner** | : | |
| | : | **No. 1:17-cr-016** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **UNITED STATES OF AMERICA,** | : | |
| **Respondent** | : | |

## <u>MEMORANDUM</u>

Before the Court is Petitioner Michael Janeski ("Petitioner")'s amended motion to vacate,

set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. Nos. 43, 69.) For the

reasons that follow, the Court will deny Petitioner's motion.

## I.     BACKGROUND

On January 31, 2017, an Information was filed charging Petitioner with Sexual

Exploitation of Children in violation of 18 U.S.C. § 2251. (Doc. No. 1.) Specifically, the

Information charged one count of Sexual Exploitation of a Minor, as follows:

> From on or about November 1, 2015, through on or about February 14, 2016, in
> the Middle District of Pennsylvania and elsewhere, the defendant, Michael Robert
> Janeski, knowingly employed, used, persuaded, induced, enticed, or coerced a
> minor (Jane Doe 1) to engage in any sexually explicit conduct for the purpose of
> producing any visual depiction of such conduct, knowing and having reason to
> know that the visual depiction would be transported or transmitted using any
> means or facility of interstate or foreign commerce, in or affecting interstate
> commerce, or that the visual depiction would be produced or transmitted using
> materials that had been mailed, shipped, or transported in, or affecting interstate
> or foreign commerce by any means, including by computer. All in violation of
> Title 18, United States Code, Section 2251(a).

(Doc. No. 1 at 1-2.) A plea agreement was filed on the same date as the Information. (Doc. No.

2.) The case was referred to United States Magistrate Judge Martin C. Carlson ("Magistrate

Judge Carlson") for a Rule 11 proceeding subject to the consent of the parties. (Doc. No. 5.)

Petitioner appeared before Magistrate Judge Carlson on February 13, 2017, and executed a

Consent to Proceed before United States Magistrate Judge for a Felony Guilty Plea (Doc. No. 11), and an Approval to Institute a Presentence Investigation before a Conviction of Plea of Guilty (Doc. No. 12). The Court adopted the Report and Recommendation as to Petitioner's Plea of Guilty on May 10, 2017, and scheduled sentencing for July 13, 2017. (Doc. No. 19.) On July 8, 2017, the Government filed a motion to continue sentencing (Doc. No. 22), and by Order dated July 10, 2017, the Court granted the motion and rescheduled Petitioner's sentencing for July 25, 2017 (Doc. No. 23). By Order dated July 12, 2017, Petitioner's sentencing hearing was continued until July 27, 2017. (Doc. No. 24.) On July 25, 2017, Petitioner's counsel, Christopher Ferro, Esq. ("Attorney Ferro") filed a Sentencing Memorandum on behalf of Petitioner. (Doc. No. 27.) The Final Presentence Investigation Report ("PSI Report") and First Addendum to that PSI Report ("Addendum") were filed one day later, on July 26, 2017. (Doc. Nos. 28, 29.)

On July 27, 2017, the Court held a sentencing hearing and ultimately sentenced Petitioner to a term of imprisonment of three hundred and sixty (360) months followed by a term of supervised release of fifteen (15) years. (Doc. Nos. 35, 36.) On May 28, 2018, Petitioner filed a pro se Motion and Affidavit for Permission to Appeal In Forma Pauperis (Doc. No. 39), as well as a copy of a pro se Petition for a Writ of Mandamus, the original of which was forwarded to the United States Court of Appeals for the Third Circuit as requested by Petitioner (Doc. No. 40). Upon subsequent review of the Third Circuit's docket in this matter, and noting that the Third Circuit granted Petitioner's motion to proceed in forma pauperis, and further, that the Third Circuit issued its Opinion and Judgment denying Petitioner's request for a writ of mandamus, see

In re Michael Janeski, No. 18-2164 (3d Cir. July 6, 2018),[1] this Court denied Petitioner's pro se

motion as moot. (Doc. No. 42.) Thereafter, on August 13, 2018, Petitioner filed a pro se motion

to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 43.)

The Court subsequently issued an administrative Order directing Petitioner to complete

the attached Notice of Election within forty-five (45) days and advising him that failure to

comply would result in the Court ruling on his Section 2255 motion as filed. (Doc. No. 45.)

After filing a Notice of Election indicating that he wanted the Court to rule on his motion as filed

(Doc. No. 48), Petitioner also filed a motion to terminate Attorney Ferro as counsel of record

(Doc. No. 49). On October 11, 2019, the Court granted Petitioner's motion to terminate

Attorney Ferro as counsel of record, and directed the Government to respond to Petitioner's

Section 2255 motion within twenty (20) days. (Doc. No. 50.) After granting the Government's

motion for extension of time to respond to Petitioner's motion (Doc. Nos. 52, 53), and noting the

Government's position that an evidentiary hearing may be necessary to resolve one or more of

Petitioner's claims, the Court directed the Clerk of Court to arrange for counsel to be provided to

represent Petitioner in this case (Doc. No. 54). On November 5, 2019, the Court issued an Order

appointing Wendy F. Grella, Esq. ("Attorney Grella") to represent Petitioner. (Doc. No. 55.) On

that same date, the Court issued an Order scheduling an evidentiary hearing in this matter for

January 28, 2020. (Doc. No. 56.) On January 13, 2020, Petitioner filed an unopposed motion

for an extension of time to file a counseled 2255 petition and to continue the evidentiary hearing.

---

[1] In its Opinion denying his mandamus petition, the Third Circuit noted that Petitioner sought
reinstatement of his appellate rights, arguing that "he was denied his right to a direct criminal
appeal because his counsel was ineffective in failing to file a notice of appeal from his judgment
of conviction"; however, the Third Circuit stated that the appropriate mechanism by which a
federal prisoner can maintain an ineffective assistance of counsel claim is through the filing of a
motion pursuant to 28 U.S.C. § 2255, and because the time limit for filing such a motion had not
yet expired, Petitioner had an "adequate alternative means of relief." See id. at 2.

(Doc. No. 60.)  The Court granted the motion and extended the relevant deadlines.  (Doc. No.

61.)  After three additional requests for an extension of time to file a counseled 2255 petition due

to delays attendant to the COVID-19 pandemic and associated lockdowns (Doc. Nos. 62-67),

Petitioner filed a counseled Amended Motion to Vacate ("Amended Motion"), with supporting

brief, on July 27, 2020 (Doc. Nos. 69, 69-1).

In his pro se motion and Amended Motion, Petitioner raises various grounds for relief,

largely on the basis of ineffective assistance of counsel.[2]  (Doc. Nos. 43, 69.)  Specifically,

Petitioner asserts the following claims regarding his representation by Attorney Ferro:

Ground One: Counsel provided ineffective assistance by failing to file a Notice of Appeal or consult with Petitioner after he expressed a desire to appeal;

Ground Two: Counsel provided ineffective assistance by failing to ensure that Petitioner's guilty plea was knowingly, intelligently and voluntarily entered and by failing to advise Petitioner of his right to move to withdraw his guilty plea;

Ground Three: Counsel provided ineffective assistance by failing to advise Petitioner of his true sentencing exposure prior to the entry of his guilty plea;

Ground Four: Counsel provided ineffective assistance of counsel in relation to sentencing;

Ground Five: Counsel provided ineffective assistance by failing to negotiate the appeal waiver and enforcing it would result in a miscarriage of justice; and

Ground Six: The cumulative prejudice of counsel's deficiencies resulted in ineffective assistance.

(Doc. No. 69 at 5-18.)

---

[2]  One of the claims raised by Petitioner challenges the application of certain enhancements under the United States Sentencing Guidelines, as follows:  "Petitioner was erroneously sentenced based on the improper application of enhancements under U.S.S.G. §§ 2G2.1(b)(4) and 3A1.3."  (Doc. No. 69 at 16.)

After granting the Government an extension of time to respond to Petitioner's Amended Motion (Doc. Nos. 73-74), the Court ultimately deferred the filing of the Government's responsive brief until further order of Court, and scheduled an evidentiary hearing on Petitioner's original motion and Amended Motion for December 18, 2020 (Doc. No. 78). The Court conducted (via Zoom) an evidentiary hearing on December 18, 2020 (Doc. No. 80), and the official transcript of the proceedings was filed on December 29, 2020 (Doc. No. 83). Thereafter, the Court issued an Order directing the Government to file a brief in response to Petitioner's original motion (Doc. No. 43) and Amended Motion (Doc. No. 69) by January 18, 2021. (Doc. No. 84.) The Government's responsive brief was filed on January 15, 2021 (Doc. No. 87), and Petitioner filed a reply brief on January 29, 2021 (Doc. No. 88). Accordingly, Petitioner's pro se motion (Doc. No. 43) and Amended Motion (Doc. No. 69) have been fully briefed and are ripe for disposition.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." See 28 U.S.C. § 2255(a). However, Section 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing. See United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing United States v. Addonizio, 442 U.S. 178, 185 (1979)). Rather, Section 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage of justice." See Addonizio, 442 U.S. at 185. Under the Antiterrorism and Effective

Death Penalty Act ("AEDPA"), a petitioner has one year from the time his conviction becomes final to file a Section 2255 motion. See 28 U.S.C. § 2244.

As noted above, Petitioner's Section 2255 challenge to his sentence is largely based on claims of ineffective assistance of counsel, with the exception of his challenge to the application of certain enhancements under the sentencing guidelines to his case. In order to establish entitlement to relief, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). See George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001). The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient." See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). This prong requires Petitioner to show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. See id. To that end, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. See id. (citing Strickland, 466 U.S. at 688). However, "[t]here is a 'strong presumption' that counsel's performance was reasonable." See id.

Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors." See id. This prong requires Petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See id. (quoting Strickland, 466 U.S. at 694). Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." See id. (quoting Strickland, 466 U.S. at 694).

**III. DISCUSSION**

As noted, <u>supra</u>, Petitioner asserts six claims of ineffective assistance of counsel, and also challenges the Court's application of the sentencing guidelines to his case. The Court considers each claim in turn.

**A. Ineffective Assistance of Counsel**

**1. Failure to File a Notice of Appeal or Consult with Petitioner After He Expressed a Desire to Appeal**

Petitioner maintains in his <u>pro se</u> motion that, despite his execution of a plea agreement containing an appellate waiver,

> [i]mmediately after sentencing, [he] informed his attorney that he wished to appeal. Petitioner specifically asked counsel what the "next step" would be in the process. In response, counsel indicated he would be over to visit Petitioner the following day at the county jail where he was being held. However, counsel never came to see Petitioner, nor did he ever even speak with him again.

(Doc. No. 43 at 13.)

In his Amended Motion, Petitioner's counsel expands on the argument initially presented in Petitioner's <u>pro se</u> motion, maintaining that "in support of [Petitioner's] contention that he requested an appeal, it is clear from the record that [Petitioner] was desirous of appealing his case to the Third Circuit Court of Appeals" because "on May 21, 2018, he filed a Motion and Affidavit for Permission to Appeal <u>In Forma Pauperis</u>," as well as a petition for a writ of mandamus. (Doc. No. 69-1 at 7-8.) Petitioner's Amended Motion also represents that "Petitioner's family will testify they called and continued to attempt to contact Attorney Ferro numerous times following Petitioner's sentencing hearing, and within the allotted fourteen (14) days requesting to file an appeal"; however, Petitioner maintains that "counsel would not call them back or failed to actually discuss the appellate process with Petitioner or his family." (<u>Id.</u> at 8.)

The Supreme Court addressed Strickland's application to counsel's failure to file an appeal in Roe v. Flores-Ortega, 528 U.S. 470 (2000). In that case, the Supreme Court held that counsel provides ineffective assistance if he or she disregards a defendant's explicit instruction to file an appeal. See id. at 477. Under such circumstances, prejudice is presumed, even where the defendant has executed an appeal waiver. See Garza v. Idaho, 139 S. Ct. 738, 746-47 (2019). If there is no evidence of an explicit request to appeal, the Court must assess whether Petitioner may have made an implicit request to file an appeal by engaging in a "circumstance-specific reasonableness inquiry" into counsel's decision not to file a notice of appeal. See Roe, 528 U.S. at 478. If the Court's inquiry reveals that "counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." See id. If the inquiry shows that counsel did not consult with the defendant, counsel performs deficiently if "there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." See id. at 480. The Supreme Court has defined "consulting" as "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." See id. at 478. In conducting its reasonableness inquiry, the Court "must take into account all the information counsel knew or should have known." See id. at 480. As to prejudice, the defendant "must demonstrate that there is a reasonable probability that, but for counsel's [ineffective assistance] he would have timely appealed." See id. at 484.

First, with regard to whether Petitioner explicitly requested that Attorney Ferro file an appeal, the Court's review of the record reveals that both Attorney Ferro and Petitioner testified

at the evidentiary hearing that Petitioner did not explicitly ask Attorney Ferro to file an appeal on his behalf.  (Doc. No. 83 at 57, 123.)  Rather, Petitioner testified that he asked Attorney Ferro after sentencing what the "next steps" were.  (Id. at 57.)  Accordingly, to determine whether Petitioner may have made an implicit request to file an appeal, the Court must engage in a "circumstance-specific reasonableness inquiry" into counsel's decision not to file a notice of appeal.  See Roe, 528 U.S. at 478.

Upon careful review of the record before the Court, the arguments presented, and the applicable law, the Court finds that Petitioner's claim of ineffective assistance on this ground lacks merit.  First, contrary to Petitioner's argument that Attorney Ferro "abandon[ed]" him by failing to meet with him at York County Prison during the fourteen day period following sentencing, see (Doc. No. 88 at 4), the Court finds that Attorney Ferro credibly testified that he consulted with Petitioner for about an hour immediately following sentencing at the federal courthouse, and discussed the issue of a potential appeal and the implications of the appeal waiver agreed to by Petitioner in connection with his plea agreement.  Attorney Ferro testified that: "I told him – and we did discuss, again, the appeal waiver that I felt was voluntarily and knowingly entered into and that he could, if he wanted to, file an appeal through me, but that I didn't think there was a basis to do so based upon our – the appellate waiver which we agreed to. And he understood that, and there were no fights or arguments about that issue."  (Doc. No. 83 at 123.)  Accordingly, under such circumstances where Attorney Ferro consulted with Petitioner regarding the issue of an appeal, Attorney Ferro's representation can only be deficient if he "fail[ed] to follow the defendant's express instructions with respect to an appeal."  See Roe, 528 U.S. at 478.  With regard to Petitioner's question to Attorney Ferro regarding "next steps" in connection with their consultation following sentencing, the Court finds that Attorney Ferro

offered credible testimony that he reasonably understood Petitioner's question to refer to the potential resolution of the still-pending York County charges against him, arising out of his interaction with the minor who was the victim in connection with the 18 U.S.C. § 2251 charge to which Petitioner pled guilty, which had been a part of their continuing discussions about Petitioner's sentencing exposure. Attorney Ferro testified that: "I can also say that we were talking about generically the next step being we still had a monster of a state case that we had to get resolved in some way, which was, at that point, likely that he may be pleading guilty to a very serious offense and undergoing a sexual offender assessment, Megan's Law." (Doc. No. 83 at 134.)[3]

As to Petitioner's argument that his family attempted to contact Attorney Ferro within the fourteen (14) days after his sentencing to request that he file an appeal, the Court finds that, even assuming that a request from a family member could impose a constitutional duty on Attorney Ferro regarding the filing of a notice of appeal, the record fails to support a conclusion that Petitioner's mother communicated a request to file an appeal to Attorney Ferro. At the evidentiary hearing, Petitioner's mother testified as follows on this point:

> Q.   Did Petitioner indicate to you he wanted an appeal?
>
> A.   Yes. He thought Chris would do that automatically.
>
> Q.   And did you relay that or attempt to relay that to Attorney Ferro?
>
> A.   I'm not sure I relayed that other than the fact that Michael needed to speak with him about what happened, you know, whatever that would entail.

---

[3] In addition, the Court notes that Petitioner's failure to fire Attorney Ferro after sentencing (and after he failed to file an appeal within the fourteen (14) day period), after being informed of that option and the possibility of receiving appointed counsel during his plea proceeding, see (Doc. No. 41 at 24-25), further supports Attorney Ferro's characterization of Petitioner's "next steps" question as pertaining to the pending York County charges, as opposed to a federal appeal.

(Doc. No. 83 at 82.)  Further, the Court notes that Defendant's Exhibit 20 (Doc. No. 81-5),

consisting of screen shots from Robert Janeski (Petitioner's father)'s phone, which Petitioner's

mother referred to in an effort to corroborate her testimony that she attempted to call Attorney

Ferro in the fourteen day period following sentencing, does not support her testimony that she

attempted to contact Attorney Ferro in the days following sentencing, as Defendant's Exhibit 20

indicates call dates in July 2018, not July 2017, when Petitioner was sentenced.[4]  (Doc. No. 81-

5.)  Accordingly, for all of the above reasons, the Court finds that Petitioner has not

demonstrated that he is entitled to relief on his claim that Attorney Ferro rendered ineffective

assistance by failing to file a notice of appeal or consult with Petitioner regarding an appeal.  The

Court turns to Petitioner's second and third claims of ineffectiveness, which are interrelated.

> **2.      Failure to Ensure that Petitioner's Guilty Plea was Knowingly,
> Intelligently and Voluntarily Entered/Failure to Advise Petitioner,
> Prior to the Entry of His Guilty Plea, of His True Sentencing
> Exposure and Failure to Advise Petitioner of his Right to Move to
> Withdraw His Guilty Plea**

As his second ground for relief, Petitioner argues that Attorney Ferro failed to ensure that

his guilty plea was knowingly, intelligently and voluntarily entered, and further, failed to advise

Petitioner of his right to move to withdraw his guilty plea.  The basis for Petitioner's argument

that Attorney Ferro failed to ensure that his guilty plea was knowingly and voluntarily entered is

addressed more fully in Petitioner's third claim for relief—that Attorney Ferro rendered

ineffective assistance by failing to advise Petitioner of his true sentencing exposure prior to the

entry of his guilty plea—accordingly, the Court addresses the claims together.

---

[4]  In addition, as the Government notes, even if the screenshots reflected the correct year, "only one of the screenshots is for a call that occurred after [Petitioner's] sentencing on the morning of July 27, 2017."  (Doc. No. 87 at 23.)

In support of this claim, Petitioner maintains that "[t]he Statement of Facts read on the record at the time of Petitioner's Guilty Plea was essentially that Petitioner induced, enticed or coerced a 14 year old female to engage in sexually explicit conduct for the purpose of producing a visual depiction, knowing that the images and videos would be transmitted using a means of interstate commerce," and that "[a]t Petitioner's Change of Plea hearing, the Assistant United States Attorney indicated that this involved Petitioner and a minor victim communicating through KIK messenger, an IPhone application, over a period of approximately four (4) months which, at Petitioner's direction, the minor transmitted sexually explicit images and videos of herself to Petitioner through the messaging program."  (Doc. No. 69-1 at 9.)

Petitioner acknowledges that "between the dates of February 12-14, 201[6],[5] Petitioner was with the minor at a hotel in Pennsylvania and was alleged to have engaged in various sexual acts with her," an interaction that Petitioner refers to as the "hotel incident."  (Id.)  Petitioner argues that the "hotel incident" was not mentioned during his change of plea hearing, and that the plea agreement he signed "did not reference the 'hotel incident' nor did it indicate anything about it being 'relevant conduct' for sentencing purposes," but that "when Petitioner received and reviewed the [PSI Report] a large portion of the 'Offense Conduct' mentioned and included the 'hotel incident.'"  (Id. at 9-10.)  Petitioner notes that the PSI Report "included offense level enhancements under U.S.S.G. §§2G2.1(b)(4) and 3A1.3 for specific acts that had nothing to do with the offense Petitioner was charged with and pled guilty to," and argues that "[t]o the extent it is relevant conduct, the inclusion of it rendered Petitioner's guilty plea constitutionally infirm because [Attorney Ferrp] never warned Petitioner that it could or would be relied upon in the

---

[5]  Petitioner's brief in support of his motion erroneously refers to these dates as "February 12-14, 2017."  (Id.)

calculation of his sentence." (Id. at 10.) Accordingly, as Petitioner maintains that he "was not properly informed of the potential consequences of pleading guilty and the possibility of these enhancements, his guilty plea should be vacated" because the "inclusion of uncharged conduct[] in the calculation of Petitioner's sentence virtually ensured that Petitioner would receive the statutory maximum 30-year sentence rather than the mandatory minimum fifteen (15) year sentence he was expecting and advised he would most likely receive." (Id.)

In connection with his third ground for relief, Petitioner argues that counsel was ineffective because Petitioner "was never made aware of the panoply of applicable sentencing enhancements that could be applied to him." (Id. at 11.) Petitioner again argues that his "plea agreement was silent as to the various sentencing enhancements," and that "at the time of the change of plea hearing, no discussion regarding the enhancements was made or the facts giving rise to the enhancements ever mentioned during the recitation of the statement of facts." (Id. at 12.) At bottom, Petitioner's claim of ineffectiveness in this regard is based on Attorney Ferro's alleged "fail[ure] to inform Petitioner about the possibility of the inclusion of the 'hotel incident' as related conduct." (Id.) Petitioner maintains that "Attorney Ferro never discussed the concept of 'relevant conduct' with Petitioner, never advised Petitioner of the definition of 'relevant conduct' and never advised Petitioner of the possibility of the 'hotel incident' being mentioned and included in the 'relevant conduct' portion of the [PSI Report]." (Id. at 12-13.) Petitioner argues that "counsel knew or should have known that the most realistic scenario was that Petitioner would be subject to multiple enhancements and face a thirty (30) year sentence under the guidelines" but "led Petition[er] into blindly accepting a Plea Agreement that almost certainly guaranteed he would receive the statutory maximum thirty (30) years." (Id. at 13.)

Additionally, Petitioner argues that "following his plea and prior to sentencing, Attorney Ferro failed to advise [Petitioner] of his right to seek to withdraw his guilty plea," and maintains that "had he known of the application of several of the sentencing enhancements he would not have entered a plea and would have exercised his right to trial." (Id.) Petitioner argues that "[b]oth the change of plea hearing and the sentencing hearing are devoid of any discussion regarding any opportunity or right to withdraw a guilty plea," and therefore, "the prejudicial impact to [Petitioner] was clear and obvious: he lost the 'liberal' opportunity pre-sentencing to attempt to withdraw his guilty plea," and is therefore entitled to relief. (Id. at 11.)

In connection with the entry of a guilty plea, counsel must provide a defendant sufficient information "to make a reasonably informed decision to accept a plea offer." See Shotts v. Wetzel, 724 F.3d 364, 476 (3d Cir. 2013). The Third Circuit has "identified potential sentencing exposure as an important factor in the decisionmaking process." See United States v. Bui, 795 F.3d 363, 367 (3d Cir. 2015). This is so because "[k]nowledge of the comparative sentence exposure between standing trial and a plea offer will often be crucial to the decision whether to plead guilty." See United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992). In advising a defendant, counsel is required to be familiar with the relevant sentencing guidelines and Circuit precedent. See Bui, 795 F.3d at 367. "However, 'an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where . . . an adequate plea hearing was conducted.'" Id. (quoting United States v. Shedrick, 493 F.3d 292, 299 (3d Cir. 2007)).

.       Upon careful consideration of the record before the Court, the arguments presented, and the applicable law, the Court finds that Petitioner's claim of ineffectiveness on the basis of Attorney Ferro's failure to inform him about his potential sentencing exposure/failure to ensure that his guilty plea was knowingly, intelligently, and voluntarily entered lacks merit. As noted

by the Government, Petitioner and Attorney Ferro presented conflicting testimony regarding the information provided by Attorney Ferro to Petitioner in advance of his guilty plea proceeding with regard to his potential sentencing exposure; however, even assuming that Attorney Ferro's representation was deficient in this regard, the Court finds that Petitioner's claim still fails under Bui in light of the comprehensive Rule 11 plea colloquy conducted by Magistrate Judge Carlson.

First, the plea agreement itself indicated that the maximum penalty for the offense to which Petitioner pled guilty was thirty (30) years' imprisonment, and that the Court could sentence Petitioner up to that maximum. (Doc. No. 2 ¶¶ 1, 21.) In addition, as to the application of the sentencing guidelines to Petitioner's case, the plea agreement stated that the Court would determine "any legal and factual issues relating to the application of [the sentencing guidelines]" and that Petitioner's disagreement with the Court's resolution "will not be grounds for withdrawal of a plea of guilty." (Id. ¶¶ 10, 18.) Moreover, the plea agreement indicated that the Government "will be permitted to bring to the court's attention, and the court will be permitted to consider, all relevant information with respect to [Petitioner's] background, character and conduct." (Id. ¶ 19.)

During the guilty plea hearing, Petitioner was twice informed that his offense carried a maximum sentence of thirty (30) years' imprisonment, and that the Court was free to impose such a sentence. (Doc. No. 41 at 12-13, 15, 19.) During the plea colloquy, Petitioner also affirmed that he had discussed the sentencing guidelines with Attorney Ferro and acknowledged that, although Attorney Ferro had provided him an estimate of his guidelines range, that estimate would not be binding on the Court, which could reach a different guideline determination, and regardless of that determination, Petitioner would continue to be bound by his plea. Specifically, Magistrate Judge Carlson questioned Petitioner as follows:

Q.     Have you and Mr. Ferro discussed those guidelines and how they might apply in your case?

A.     Yes, we have.

Q.     I would fully expect Mr. Ferro would do just that for you. Has anyone estimated for you what those guidelines may be?

A.     Yes, Your Honor.

Q.     And again, I would fully expect that Mr. Ferro would have provided you with some estimate of what those guidelines would be, but do you understand that Mr. Ferro's estimate is just that, it's an estimate and it's not binding on Judge Kane who will be the sentencing judge in this case. Do you understand that?

A.     I do understand that, Your Honor.

Q.     So if she reaches a difference view of the guidelines, you'll still be bound by this plea. Do you understand that?

A.     Yes, I do, Your Honor.

(Doc. No. 41 at 17-18.) The plea colloquy also contained a thorough discussion of the appeal waiver contained in the plea agreement. (Id. at 20-21.)[6]

---

[6]

Q.     And ordinarily you would have the right to appeal any sentence imposed upon you. But directing your attention to paragraph 31 of the plea agreement on pages 25 and 26. And perhaps if you take a look there? In paragraph 31, you waive or give up the right to take a direct appeal of any sentence that is imposed upon you. You acknowledge that you know you have a right to appeal, but you indicate that you are giving up, waiving that right to an appeal. Do you recall going over this paragraph with Mr. Ferro?

A.     Yes, I do, Your Honor.

Q.     And did you all separately discuss waiving, giving up your right to appeal any sentence in this case?

A.     Yes, I did, Your Honor.

Q.     And was that a decision by you that was a voluntary decision on your part?

A.     Yes, it was, Your Honor.

(Doc. No. 41 at 20-21.)

With specific regard to Petitioner's argument that the statement of facts presented by the Government at the plea hearing did not reference the "hotel incident," the Court notes the Government's position that "[t]hat is not surprising since the factual statement needed to support only the charge of producing child pornography as opposed to all relevant conduct." (Doc. No. 87 at 27 n.4.) The Court questioned Attorney Ferro with regard to this issue at the evidentiary hearing, as follows:

> Q.    If I understand you right, Attorney Ferro, you said that you received a written statement from Chelsea Schinnour just before the guilty plea was entered and it was made available what the facts were going to be at that point. Is that so?
>
> A.    Actually, Your Honor, that's incorrect. I recall in this case that me and Ms. Schinnour, days in advance of the plea she sent me the proposed facts. I know I had some edits and amendments to that, which she agreed to. So it was a work in progress. Now, I did not show it to the defendant until the day of the plea.
>
> Q.    At any point in the negotiation of what the statement of facts would be was there ever any inclusion of the so-called hotel incident?
>
> A.    There was never anything in there.
>
> Q.    Would you have ever taken the position that more facts should be included?
>
> A.    No, Your Honor.
>
> Q.    Did Chelsea Schinnour take that position, that the magistrate judge should be informed of the additional facts upon the entry of the guilty plea?
>
> A.    She did not demand it and agreed – and quite frankly, agreed to limit – I forget what we edited out, but I think we may have edited out something regarding the nature of the images or the amount of the images, and she accepted to do so.
>
> Q.    Did the abbreviated statement of facts have anything to do with the fact that there were still charges pending in York County related to this case?

A.      I do not believe so, no, Your Honor.

Q.      Did the abbreviated nature of the statement of facts seem consistent to what has been the standard practice in the Middle District in your experience?

A.      Yes, Your Honor. And to answer your last question a little bit better, I was certainly mindful at that time that we had a pending state prosecution regarding the actual – again, not a great term, but nuts and bolts of what took place inside the hotel room, so I was cognizant of the fact that I did not want the defendant to have to acknowledge more than necessary to achieve the federal plea while that other matter was still ongoing.

(Doc. No. 83 at 149.) The Court also notes that, by virtue of the dates indicated in the statement of facts (referring to conduct beginning in November 2015 and "continuing through February 15th of 2016"), the factual statement implicitly referred to the hotel incident, which occurred on February 12-14, 2016. (Doc. No. 41 at 11.) Accordingly, upon consideration of all of the above, and in light of the contents of the plea agreement and the plea colloquy, which fully informed Petitioner of the statutory maximum sentence under the guidelines, and the Court's discretion regarding his potential sentence, the Court finds that, even if it were to assume that Attorney Ferro's advice to Petitioner was deficient in this regard, Petitioner's claim of ineffective assistance with regard to his knowledge of his potential sentencing exposure and the "knowing and voluntary" nature of his guilty plea lacks merit. See Shedrick, 483 F.3d at 299 (finding that "where the written plea agreement and in-court guilty plea colloquy clearly establish the defendant's maximum potential exposure and the sentencing court's discretion," it was "inconceivable" that the defendant did not know that he faced the potential of a statutory maximum prison term).

However, the entirety of the evidence presented at the hearing of this matter persuades the Court that Attorney Ferro did not perform deficiently, and that he ensured that Petitioner's guilty plea was entered knowingly and voluntarily with a full understanding of the potential

consequences.  Prior to the filing of the Information against him, Petitioner already faced

multiple charges in York County, including involuntary deviate sexual intercourse and rape.

(Doc. No. 28 ¶ 44.)  Attorney Ferro testified that, after being retained by Petitioner following the

filing of those charges, he estimated Petitioner's possible sentencing exposure with regard to

those state charges, advising him that he could receive multiple consecutive sentences resulting

in significant prison time, amounting to potentially ten (10) to twenty (20) years.  (Doc. No. 83 at

87-88, 102.)  He further testified that he later received a target letter from the United States

Attorney's Office, identified as Government Exhibit 1, indicating that Petitioner was under

investigation for potential violations of 18 U.S.C. §§ 2241, 2242, and 2243.  (Id. at 89; Doc. No.

82-1.)  Attorney Ferro sent a letter to Petitioner enclosing that letter (Government Exhibit 2),

informing him that the possible federal charges "would potentially escalate your exposure based

upon the alleged criminal conduct."  (Doc. No. 83 at 92-93; Doc. No. 82-2.)  Attorney Ferro

testified that a charge under Section 2241 would mandate a prison term between thirty (30) years

and life.  (Doc. No. 83 at 93.)

Accordingly, in light of the potential thirty years to life of combined state and federal

prison time faced by Petitioner, Attorney Ferro testified that he developed a strategy to pursue a

federal plea agreement that would limit Petitioner's federal sentencing exposure while also

potentially eliminating his state sentencing exposure.  (Id. at 94-95.)  He testified that "we talked

about the possibility of negotiating with the various entities to see whether or not we could

produce a plea agreement in federal court that would limit our exposure and also potentially take

out the county exposure."  (Id. at 95.)  Attorney Ferro testified as follows regarding his

negotiations with the Government regarding a potential plea agreement:

> Q.  Did you have discussions with AUSA Schinnour about a potential federal
> plea agreement?

> A.  I did, multiple discussions with her.
>
> Q.  Did she tell you one way or another whether she intended to proceed with federal charges if [Petitioner] did not agree to plead guilty prior to an indictment?
>
> A.  During phone calls and emails, she made it abundantly clear that if we were not able to reach an agreement, that she absolutely intended to move forward with an indictment with respect to some or all of the listed charges in our target letter.

(Id.)  Attorney Ferro testified that he subsequently received a proposed plea agreement from the Government in September of 2016, which agreement provided that Petitioner would plead guilty to one count of sexual exploitation of a child (production of child pornography), in violation of 18 U.S.C. § 2251(a), an offense with a sentencing range of fifteen (15) to thirty (30) years.  (Id. at 96; Doc. No. 2.)

Attorney Ferro testified that he discussed the plea agreement with Petitioner on several occasions, one of which was memorialized by notes taken by him dated October 6, 2016 (Government Exhibit 4).  (Doc. No. 83 at 97-98; Doc. No. 82-3.)  Those notes indicate that Attorney Ferro and Petitioner reviewed the plea agreement and discovery, discussed state and federal sentencing guidelines, and also the issue of consecutive sentencing.  (Doc. No. 83 at 98-99; Doc. No. 82-3.)  Attorney Ferro testified that Petitioner had reported to him that he was fearful for his safety at York County Prison, and therefore did not want discovery materials sent to him there; accordingly, Attorney Ferro testified that they reviewed the state discovery materials in person.  (Doc. No. 83 at 98-99.)  With specific regard to their discussion and the sentencing guidelines, Attorney Ferro testified as follows:

> Q.  In the notation showed – or, excuse me, state and federal sentencing guidelines, so would you have provided an estimate to [Petitioner] in October of 2016 about his guidelines in both cases?

A. Yes, because at that point we had the state discovery and I knew exactly what the guidelines were at that point in time. And we had a proposed plea agreement with a specific charge, and we began to talk about the mandatories and the potential enhancements associated if we decided to take this plea.

Q. With respect to the federal guidelines in particular, did you say anything to [Petitioner] about your level of certainty with respect to your guideline estimate?

A. I told him it's going to be a challenge. Because of the nature of the enhancements involved, that we clearly knew we were looking at 15 years. That I told him for sure. I told him the max, it capped our exposure at 30 years, but that there were at least five or six enhancements that could significant escalate guidelines from somewhere within the 15-year range up to the statutory max of 30.

Q. Did [Petitioner] indicate that he understood that?

A. Yeah. Again, Mike was a – Mike is a smart guy, and so he understood the issue. He wasn't happy about it, but I believe he understood what enhancements were and how they would come into play with respect to the sentence.

(Id. at 99-100.) Attorney Ferro testified that the federal guideline estimate that he discussed with

Petitioner included his consideration of the "hotel incident" as potential relevant conduct, as

follows:

Q. You mentioned earlier that you did do a guideline estimate for potential federal guidelines. Did you discuss that estimate with [Petitioner]?

A. Yea, I believe at the first meeting and then probably when we actually signed it we discussed it again.

Q. And in your guideline analysis, did you consider that the physical contact with the victim that occurred in York from February 12th to 14th of 2016 could be considered relevant conduct and result in enhancements under the guidelines?

A. Yes. Whether right or wrong, that was – I already assumed that that was relevant conduct and felt that that would be part and parcel of the sentencing guidelines, so that was in every discussion that my assessment of the guidelines involved that.

21

Q.	And in your discussions with Petitioner, did you tell him that it was likely that that contact would be incorporated into the federal guidelines?

A.	Well, I don't remember having a conversation with him in the weeks about whether it could or couldn't. I just remember when we talked about guidelines, telling him these are the enhancements we're up against, and these are how it could play out, and I can get legitimate challenges to these enhancements, but ultimately it could sway our guidelines probably 15 years.

Q.	And were some of those enhancements based on what occurred on February 12th through the 14th, 2016?

A.	Yes.

Q.	What was [Petitioner's] reaction when you explained the potential guideline enhancements and your guideline calculation?

A.	Well, we talked a lot about the facts. You know, one of Michael's main issues was that this was a, for lack of a better term, consensual sexual relationship, that they met, she consensually provided him photographs. When they got together in person, that it was – the sole purpose of getting together was to engage in consensual sex. And so a lot of the enhancements he had to deal with, force and coercion, harm to a child, and I'm blanking on some of them, but we talked about that factually some of those things should not be applicable because that wasn't what happened.

(Id. at 104-105.) The Government also offered into evidence a letter (Government Exhibit 5) from Attorney Ferro to Petitioner dated November 28, 2016 (Doc. No. 82-4), sent in follow-up to their October meeting, wherein Attorney Ferro noted that "the proposed plea, pursuant to the Agreement, will result in a mandatory minimum sentence of 15 years with a maximum sentence of 30," and stated that "if the state would be willing to run their sentences concurrent with the proposed federal sentence it would likely be our best bet scenario to resolve all of these matters." (Id.) The letter further informed Petitioner that "[i]f we do not reach a plea agreement, I am

certain that the federal government will indict you on various charges regarding the incident that occurred with the minor child." (Id.)[7]

Attorney Ferro testified that, prior to Petitioner's approval and execution of the plea agreement, he attempted to negotiate with AUSA Schinnour to make a sentencing recommendation that certain enhancements should not apply to Petitioner, including the enhancement relevant to the use of force, and to remove the appeal waiver from the plea agreement. (Doc. No. 83 at 106.) However, he testified that "she was not willing to do so," and

> [s]o when I went back to speak with [Petitioner] after our first meeting and ultimately before we executed, I said that, you know, I had made every effort to

---

[7] Petitioner argues that he was unaware of the contents of that letter because it was sent to him care of his parents at their address in New Jersey, as opposed to him at York County Prison. (Doc. No. 88 at 5.) At the hearing, Attorney Ferro offered credible testimony that he sent the letter to Petitioner at his parents' address in New Jersey pursuant to Petitioner's request that he not send any documents associated with the case to Petitioner at York County Prison, and Petitioner's assurance that he communicated frequently with his parents, who would inform him of the contents of any communications from Attorney Ferro. Attorney Ferro testified as follows:

Q. Why did you sent the letter to Edison, New Jersey?
A. As soon as [Petitioner] went into the York County Prison, I met with him, and he advised me and begged me not to send any documents associated with this case to the York County Prison. He was scared that anything that came from me could be used by other inmates. And based upon the subject matter of the cases involved, he did not want to be – did not want other inmates finding information about his case and was concerned for his safety. And his parents, Robert and Jan, who I was engaged with fairly often, they would basically call him, I think on a regular basis, almost nightly, and so he told me to send it to his parents' address and that they would provide him with anything that needed immediate attention if I couldn't get out there right away.
Q. And did you agree to send correspondence and other materials to his parents rather than to [Petitioner] himself?
A. I did. I was slightly reluctant. I mean, I like that direct communication. But I believed the parents would be reliable with his information, to provide it to him. I certainly believed he fully waived any and all issues regarding privilege. That was exactly what he wanted, and I thought that was a knowing and voluntary decision. And I certainly understood why he was concerned, and so I was willing to do that.

(Doc. No. 83 at 91-92.)

> ask her to concede to sentencing recommendations. I had also asked her to
> remove the appeal waiver. I think that may have been the big thing. I can't
> remember anything else. But ultimately, I came back to [Petitioner] and said the
> plea agreement is exactly as it was in October, they're not willing to make those
> changes, and we can either accept it and take our chances with the court or reject
> it altogether and proceed to trial – or reject it altogether and at that point I
> probably would have said wait for the inevitable indictment.

(Id.) Attorney Ferro testified that the York County District Attorney's Office ultimately agreed that, if Petitioner signed the federal plea agreement, that office would "at worst, run any of their charges concurrent with any federal sentence," and so Attorney Ferro ultimately recommended that Petitioner accept the plea agreement. (Id. at 108.) Attorney Ferro testified that, in making that recommendation, it was significant to him that: the plea agreement did not include a plea to a Section 2241 charge, which was identified in the target letter and carried a potential sentence of thirty years to life; and that the plea was to only one Section 2251 charge, as the facts may have supported multiple charges, which would have increased Petitioner's maximum potential sentence. (Id. at 107-08.)

The Court finds the above testimony and documentary evidence offered by the Government to be credible and to support the Court's conclusion that the plea agreement, the plea colloquy, and Attorney Ferro adequately informed Petitioner of his potential sentencing exposure ranging from a minimum of fifteen (15) to a maximum of thirty (30) years prior to his execution of the plea agreement, and that Petitioner's guilty plea was knowingly, intelligently, and voluntarily entered into by Petitioner. To the extent that Petitioner testified to the contrary, the Court finds that testimony to be less than credible. As an initial matter, Petitioner's testimony at the evidentiary hearing with regard to his knowledge of his potential sentencing exposure conflicts with his representations to Magistrate Judge Carlson during his plea proceeding. During his plea colloquy, Petitioner testified that he understood that the Court's

determination as to the guidelines could differ from any estimate provided by Attorney Ferro and that he could be sentenced to a term of up to thirty (30) years. (Doc. No. 41 at 17-19.) In addition, Petitioner testified that Attorney Ferro never discussed his potential sentencing exposure on the York County charges; however, documentary evidence presented at the hearing demonstrated that Attorney Ferro discussed Petitioner's York County sentencing exposure during their October 16, 2016 meeting (Doc. No. 82-3), and further, that Attorney Ferro included an estimate of that sentencing exposure in a November 2016 letter sent to Petitioner (Doc. No. 82-4). As a further indictment of his credibility, the Court notes that, as to the issue of the appeal waiver, Petitioner in his mandamus petition to the Third Circuit stated that he believed the only waiver he had signed "was to waive a jury trial," see (Doc. No. 40 at 2), despite the fact that, during the comprehensive plea colloquy, Magistrate Judge Carlson ensured that Petitioner understood that the waiver executed by him meant a waiver of the right to appeal any sentence imposed. See supra at n.6. Moreover, Petitioner testified at the hearing of this matter (after representing in his mandamus petition that he understood the appeal waiver to apply only to a jury trial) that he understood the appeal waiver involved more than a waiver of the right to go to trial. (Doc. No. 83 at 57-58.) For all of the above reasons, where Attorney Ferro and Petitioner offered conflicting testimony, the Court credits the testimony of Attorney Ferro as to the sentencing exposure advice he provided to Petitioner prior to the entry of his guilty plea. Accordingly, the Court finds that Petitioner has not demonstrated that he is entitled to relief on his claim that his guilty plea was not knowingly and voluntarily entered because Attorney Ferro did not apprise him of his potential sentencing exposure.

Further, for all of the above reasons, the Court also concludes that Petitioner's claim that Attorney Ferro rendered ineffective assistance because he did not advise Petitioner that he could

seek to withdraw his guilty plea lacks merit.  As noted by the Government, after a court accepts a guilty plea, but prior to sentencing, a defendant may withdraw his plea if he "can show a fair and just reason for requesting the withdrawal."  See Fed. R. Crim. P. 11(d)(2).  In making this assessment, the Court considers whether "(1) the defendant asserts his innocence; (2) the defendant proffered strong reasons for the withdrawal; and (3) the government would be prejudiced by the withdrawal."  See United States v. King, 604 F.3d 125, 139 (3d Cir. 2010) (internal quotation marks omitted).  As relevant here, Petitioner does not maintain his innocence, but rather, his reason for withdrawal—Attorney Ferro's alleged failure to advise him adequately regarding potential sentencing enhancements—is evaluated under a Strickland analysis.  See United States v. Jones, 336 F.3d 245, 253-54 (3d Cir. 2003).  As discussed more fully above, Attorney Ferro's performance was not deficient with regard to his advice to Petitioner regarding his sentencing exposure, but even if the Court assumes that it was, "any prejudice resulting from an erroneous sentencing prediction is cured by a thorough Rule 11 plea colloquy."  See United States v. Cormier, 758 F. App'x 269, 275 (3d Cir. 2018).   Accordingly, the Court finds that Petitioner has not demonstrated entitlement to relief on this claim.  The Court turns to Petitioner's fourth claim of ineffectiveness.

### 3. Failure to Provide Effective Representation in Connection with Sentencing

As his fourth ground for relief, Petitioner, in his Amended Motion, contends that counsel provided him ineffective assistance in connection with his sentencing, in four (4) ways.  First, Petitioner asserts that "Counsel never reviewed the [PSI Report] with Petitioner nor did he review the [PSI Report] Addendum with Petitioner before [s]entencing," and that "the [s]entencing transcript lacks an acknowledgement from counsel that he reviewed the [PSI Report] with Petitioner and, an acknowledgement from Petitioner that the [PSI Report] was

reviewed with Petitioner by Counsel," which Petitioner maintains satisfies the standard of prejudice and entitles him to relief. (Doc. No. 69-1 at 13-14.) Secondly, Petitioner argues that Attorney Ferro "failed to advise Petitioner and did not object to the inclusion of events from the 'hotel incident' for sentencing purposes," and since "Petitioner was never properly admonished in the Plea Agreement or during the guilty plea hearing that such matters would be used in calculating his sentence Petitioner submits no enhancements should have been permitted based on the 'hotel incident' and he was prejudiced by said inclusion." (Id. at 14.) Third, Petitioner maintains that "counsel should have called the alleged minor victim as a witness at sentencing" because he maintains that there were "disputed questions of fact" with regard to whether "there was ever any physical restraint or force used in connection with the 'hotel incident.'" (Id.) Petitioner argues that "the only evidence relied upon to sustain the enhancement was a summary in the [PSI Report] that did not even contain the actual statements of the minor" and that counsel was ineffective for "failing to investigate the matter and subpoena[] the alleged victim" which he maintains "resulted in Petitioner receiving a sentencing enhancement and ultimately increased his sentencing guidelines." (Id.) Fourth, Petitioner maintains that counsel was ineffective in connection with sentencing because he "fail[ed] to obtain an expert witness to interview Petitioner and conduct a sexual offender risk assessment before sentencing" because "[s]uch a report could have revealed Petitioner is not someone with a high risk of reoffending which may have convinced [the Court] to impose a lower sentence." (Id. at 15.)

With regard to Petitioner's first argument that Attorney Ferro was ineffective in connection with sentencing—by failing to review the final PSI Report and Addendum with him, and by failing to ensure that the Court confirmed at sentencing that those documents had been reviewed with him—the Court notes that the Government maintains that these claims are

untimely, as they were not included in Petitioner's initial pro se motion, filed on August 13, 2018, within the applicable one-year time limitation, but instead were initially presented by way of the Amended Motion filed by Attorney Grella on July 27, 2020.  (Doc No. 87 at 40.)  The Government maintains that any claims regarding the final PSI Report, Addendum, and Petitioner's review of those items is not connected by a "common core of operative facts" to any of the claims presented in Petitioner's initial motion and therefore are not part of the same "conduct, transaction or occurrence" such that the claims relate back to the Petitioner's timely-filed pro se motion.  (Id. at 40-41.)  The Government relies on authority holding that it is not enough that the new claims relate to sentencing and that sentencing-related claims were presented by way of the initial motion, or that the new claims allege ineffective assistance of counsel, as did claims presented by way of the initial motion.  (Id. at 41) (citing Mayle v. Felix, 545 U.S. 644 (2005); United States v. Gonzalez, 592 F.3d 675 (5th Cir. 2009); Armstrong v. United States, No. 15-cv-1520, 2018 WL 1641234 (M.D. Pa. Apr. 2, 2018)).

Upon review of the authorities cited by the Government, Petitioner's pro se motion and Amended Motion, the Court is not persuaded that Petitioner's claim regarding Attorney Ferro's failure to review the final PSI Report with Petitioner and the Court's failure to ensure that such review occurred is connected by a "common core of operative facts" to any of the claims presented in Petitioner's initial timely-filed pro se motion, rendering this claim untimely. However, even assuming that the claim properly related back to Petitioner's timely-filed motion, the Court concludes that the claim lacks merit.  Attorney Ferro testified that he reviewed the draft PSI Report with Petitioner, as follows:

> Q.    I'll next show you Government's Exhibit 8.  This is a letter from
>        you to [Petitioner] at the New Jersey address sent on May 17th,
>        2017.  Is that right?

A. Correct.

Q. The last sentence of the first paragraph says, Obviously the presentence investigation report is the most critical matter to review and resolve before sentencing. Why was that your view?

A. Because we knew that there were going to be various sentencing enhancements that the probation officer would likely include that were going to require litigation or argument to resolve.

Q. After the probation office issued the draft presentence report, did you review that with [Petitioner]?

A. I did.

Q. I just put on the screen Government's Exhibit 9, which is also Document Number 20 in this case. Is this the draft presentence report that was filed by the probation office?

A. Yes.

Q. I'm going to scroll through this document, and I'll first, at the top of Page 5, PDF Page 5, on that page there are some sentences that are underlined, as well as some handwritten notations. Who did the underlining and the notations?

A. Me.

Q. And when would you have made these markings?

A. When we were at the prison talking about the case, sort of – kind of the best way for me to remember some of the things, the high points of what we were talking about and the things that we were going to address moving forward.

Q. And that was when you were actually with [Petitioner] reviewing the draft [PSI Report]?

A. Yes.

Q. Do you recall what the underlines on this page represented?

A. Just, again, factual discussions that we would have regarding matters that I thought would play some role in some of the enhancements.

Q.    And under Paragraph 9, there's a notation that reads, Grandmother provided defendant with directions.  Do you recall why you made that notation?

A.    I do.

Q.    Why?

A.    It was [Petitioner's] position that the grandmother had provided him the last leg of directions to get to the house to pick up the alleged victim.

Q.    Was it his view that that would affect his culpability in some way?

A.    Yes, I think that's fair statement.

Q.    We'll next go to the next page, which is PDF Page 6. There's a notation above Paragraph 15.  Does that indicate that the defendant waited for two hours?

A.    Yes.

Q.    Do you recall why you made that notation?

A.    Again, sort of the same theme, you known, the fact that [Petitioner] felt it would limit his culpability relative to the interaction, meeting with the victim.

Q.    We'll next go to PDF Page 8.  On this page, three enhancements are highlighted.  Do you recall why you highlighted those enhancements?

A.    I believe those – I believe those are ultimately the enhancements that we filed challenges to.  I don't remember highlighting them, but that's my best guess looking at it now.

Q.    Now I'm jumping ahead to Paragraph 49 on PDF Page 11.  Next to and below Paragraph 49 there are a few notations.  Are you able to read what those say?

A.    I believe my note, it says, Mary Kovacs, K-o-v-a-c-s, and then another notation that's his biological sister.  I don't recall specifically what that means now, but that was – those are my notes on things we were talking about.

Q.      Had [Petitioner] raised other issues with you while you were
        reviewing the draft [PSI Report] with him, would you have noted
        them in a similar manner?

A.      I would think so, yes.

Q.      What, if anything, did [Petitioner] say to you about the events of
        February 12 through 14, 2016, being included in the [PSI Report]?

A.      I don't remember a specific conversation regarding anything other
        than sort of the notes of kind of some small differences and
        variations of some of the matters being stated therein.

Q.      Did he exhibit any sort of surprise about those events being
        included?

A.      No.

Q.      Did he ever indicate, after reviewing the [PSI Report], that he was
        interested in trying to withdraw from the guilty plea?

A.      No.

Q.      And you ultimately did lodge a series of objections to the draft
        [PSI Report]. Is that right?

A.      That is correct.

Q.      Okay.  Did you review those objections with [Petitioner]?

A.      I don't think I would have.  I mean, from our conversations, I
        believed that we were on the same page, but I viewed the
        objections, the legal issues being raised therein were my role.  So I
        believe I prepared them and sent them to probation without
        providing him a draft.  We talked about them at a later date and
        time, but I would say no.

Q.      When you talked to [Petitioner] about them at a later date and time,
        did he indicate to you that he wanted additional objections to be
        raised?

A.      No.  I guess he thought they were good, if I recall.  Obviously he
        was happy with the approach we were taking to try to minimize
        exposure.

Q.      And that review of the objections with [Petitioner], would that have occurred before he was sentenced?

A.      Yes. And it would have been when – in anticipation of preparing a final sentencing agreement we met – sentencing memorandum, rather.

Q.      Next, he was sentenced on July 27, 2017. Correct?

A.      Sounds correct, yes.

Q.      And did you meet with him prior to sentencing?

A.      I did.

Q.      I'd like to show you what's been marked as Government's Exhibit 10. Can you please describe this document?

A.      I believe they're a copy of my notes. The top line says, Meeting with Michael Janeski at YCP. And then going down, Credit for time at YCP. Next line, Allenwood, close to New Jersey, close to NJ. Search incident to arrest, zero infractions while incarcerated, and Mom with a phone number.

Q.      In the meeting where you took these notes, that occurred on July 20, 2017?

A.      Correct.

Q.      The final [PSI Report] was not filed until July 26, 2017. Is that right?

A.      Correct.

Q.      So is it right that you did not have the chance to review that final report with [Petitioner] prior to sentencing.

A.      That's correct. There were no changes from the original presentence report, that I recall, to the final, because they had already told me at that moment, Ms. Shreve, that they were not going to make any changes or modifications to the plea agreement – or to the presentence investigation based upon our objections.

(Doc. No. 83 at 112-117.)

The above credible testimony establishes that, in light of the fact that the final PSI Report and Addendum were filed only the day before sentencing, it would have been significantly difficult for Attorney Ferro to have reviewed those documents with Petitioner prior to sentencing; however, given that, as Attorney Ferro testified, the final PSI Report contained no relevant revisions from the draft PSI Report, which the record reflects Attorney Ferro reviewed thoroughly with Petitioner, Attorney Ferro did not provide deficient representation to Petitioner by any failure to review those documents with Petitioner, or any failure to object at sentencing regarding a verification that Petitioner had read and discussed those documents with Attorney Ferro. Moreover, even if the Court assumes that Attorney Ferro's failure in this regard constituted deficient representation, Petitioner has not attempted to establish prejudice resulting from any deficiency, and therefore, Petitioner has not demonstrated an entitlement to relief on this claim.

As to Petitioner's second claim of ineffectiveness in connection with sentencing—that Attorney Ferro failed to advise Petitioner with regard to and object to the inclusion of the 'hotel incident' as relevant conduct for purposes of sentencing—the credible evidence canvassed above indicates that Attorney Ferro did advise Petitioner that such conduct would be relevant for sentencing, and moreover, as noted by the Government, the plea agreement signed by Petitioner stated that, in connection with sentencing, "the Government would provide the probation office 'all information in its possession' that the Government 'deems relevant regarding [his] background, character, cooperation, if any, and involvement in this or other offenses.'" (Doc. No. 87 at 43-44) (quoting Doc. No. 2 ¶ 17). Accordingly, Petitioner has not demonstrated an entitlement to relief on this claim.

The Court similarly finds unavailing Petitioner's third claim of ineffectiveness in connection with sentencing—that Attorney Ferro should have called the minor victim to testify at sentencing "to resolve disputed questions of fact." (Doc. No. 69-1 at 14.) Attorney Ferro provided credible testimony that he made the reasonable strategic decision not to call the minor victim as a witness at sentencing, for the following reasons:

> Q. Did you consider trying to subpoena the victim so that she would testify at sentencing?
>
> A. I considered it, yes,
>
> Q. And what was the result of your consideration?
>
> A. I believed it would not be a net-plus for the defense. Two reasons: One, she had given statements previously through local discovery which I believed would be harmful to our objections. Now, while she was inconsistent, I certainly did not know exactly what she would say if called to the stand. We certainly had one version that would not be helpful to us on certain objections. And then, two, because there was a state case, I actually saw this person in advance of the federal sentencing hearing, and I recalled being struck with how incredibly slight she was or tiny and young looking she was, and I believed her appearing in person discussing these matters in front of the judge would ultimately be more harmful than helpful. The analysis of the ages, the size, you know, I think it would be striking. I felt it would have been striking.

(Doc. No. 83 at 118-119.) Moreover, even assuming that Attorney Ferro's representation was somehow deficient in this regard, Petitioner has failed to demonstrate prejudice by showing what the minor victim would have said and how that would have helped him. See Campbell v. Burris, 515 F.3d 172, 184 (3d Cir. 2008) (finding that defendant did not establish prejudice because he failed "to allege what this witness would have been able to say that would have been of help to

him"). Accordingly, for both of these reasons, Petitioner has failed to demonstrate an entitlement to relief on this basis.[8]

Petitioner's fourth challenge to Attorney Ferro's representation in connection with sentencing is his claim that Attorney Ferro should have obtained an expert witness to testify on his behalf at sentencing, as he maintains that a sexual offender risk assessment "could have revealed Petitioner is not someone with a high risk of reoffending which may have convinced" the Court to impose a lesser sentence. (Doc. No. 69-1 at 15.) This claim is unavailing. First, Petitioner argues only that the assessment he says Attorney Ferro should have sought "could have" demonstrated that he does not have a high risk of reoffending and that such a demonstration "may have convinced" the Court to alter its decision regarding the sentence imposed, but he has not attempted to show what such an expert witness would have said in support of Petitioner at sentencing.

Further, Petitioner has not demonstrated that the failure to obtain an expert witness amounted to deficient representation where the entirety of Attorney Ferro's presentation to the Court in connection with sentencing—consisting of the sentencing memorandum submitted by him on Petitioner's behalf, character letters, and the arguments he made at sentencing— addressed the issue of Petitioner's low risk of recidivism. (Doc. No. 27 at 14-18, 20-21; Doc. No. 38 at 30-34); see Harrington v. Richter, 562 U.S. 86, 111 (2011) (stating that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy"); United States v. Clark, 652 F. App'x 103, 105 (3d Cir. 2016) (finding that

---

[8] As noted by the Government, in connection with his third challenge to Attorney Ferro's representation in connection with sentencing, Petitioner briefly references other issues that he maintains Attorney Ferro should have brought to the attention of the Court in connection with sentencing; however, also as noted by the Government, Petitioner does not attempt to explain how these issues would have impacted his sentencing.

"[a]t best, the expert testimony Clark sought would have been duplicative of evidence and arguments introduced by counsel through other means"). Moreover, the Court notes that, at sentencing, the Court stated that the length of sentence it imposed on Petitioner was largely based on the "nature and circumstances" of Petitioner's offense, as opposed to his risk of recidivism. (Doc. No. 38 at 39.) For all of these reasons, the Court finds that Petitioner has not demonstrated an entitlement to relief on his claim of ineffective assistance of counsel in connection with sentencing. The Court turns to Petitioner's claim that it would be a miscarriage of justice for the Court to enforce the appeal waiver.

### 4. Failure to Negotiate the Appeal Waiver and Enforcing it Would Result in a Miscarriage of Justice

As his next ground for relief, Petitioner argues that "because trial counsel was ineffective for failing to discuss [Petitioner's] overall sentencing exposure, it would be a miscarriage of justice to enforce the [appeal] waiver," maintaining that "[t]he prejudice to Petitioner resulted in a substantial increase in his sentencing guidelines, doubling his mandatory minimum, and ultimately, the sentence imposed by the Court." (Doc. No. 69-1 at 16-17.) Petitioner asserts that "counsel clearly was ineffective in recommending a [p]lea [a]greement containing a waiver of appeal rights where there was a strong possibility that Petitioner's sentence would be subject to various contestable enhancements," and that "Petitioner received no benefit from waiving his appellate rights." (Id. at 17.)

Upon careful review of the record before the Court, the arguments presented, and the applicable law, the Court finds that Petitioner's claim of ineffective assistance in this regard lacks merit. Attorney Ferro credibly testified that he attempted to persuade the Government to remove the appeal waiver from the plea agreement, but was unsuccessful, testifying as follows at the evidentiary hearing:

Q.      At any point during your representation of [Petitioner] – well, excuse me, let me ask you a slightly different question.  Prior to sentencing, did you ever discuss with [Petitioner] the possibility of appealing?

A.      Well, we talked about, when going through the plea agreement on multiple occasions, the fact that the government had mandated an appeal waiver and what that meant.  And again, you know, for what it's worth, I asked the government to remove that at that particular moment in time.  In your office, that was really not an option, and in light of them only filing an information on a singular charge and not indicting on all of the other charges, [AUSA Schinnour] was steadfast that that to be part and parcel of our agreement.  I didn't like it then, I don't like it now, but it was part of the agreement, and [Petitioner] knew that.  And I did believe that significant limited our appeal, and he knew that significantly limited any potential appeal.

….

Q.      Mr. Ferro, when we left off, I think we were talking about an appeal.  Prior to sentencing, did [Petitioner] ever say anything to you about possibly being interested in appealing?

A.      No.

Q.      And you said –

A.      You said prior to sentencing when we would meet and discuss the plea agreement?

Q.      That's correct.

A.      No.

Q.      And in your meeting that you had with [Petitioner] in the week or so before sentencing, did he ever say that he might be interested in appealing?

A.      No.

Q.      You said earlier that you met with [Petitioner] in the marshal's lockup immediately following sentencing for about an hour or so.  Is that right?

A.      That's correct.

Q.      During that meeting, did he ever indicate to you that he was interested in appealing?

> A. No. We discussed the sentence. I mean, that was probably the bulk of it, the ruling, et cetera. We discussed placement in prison. We discussed things about his family. I told him – and we did discuss, again, the appeal waiver that I felt was voluntarily and knowingly entered into, and that he could, if he wanted to, file an appeal through me but that I didn't think there was a basis to do so based upon our – the appellate waiver which we agreed to. And he understood that, and there were no fights or arguments about that issue.

(Doc. No. 83 at 121-123.) The Court also notes that, as detailed more fully above, during Petitioner's plea colloquy, Magistrate Judge Carlson confirmed that Petitioner understood that he was waiving his appellate rights and that it was possible that he would receive a sentence of as much as thirty years. (Doc. No. 41 at 13-26.)

Finally, the Court notes that, as to Petitioner's argument that he received no benefit from the appeal waiver, testimony presented at the hearing of this matter demonstrated that, by pleading guilty and executing the plea agreement, Petitioner avoided the possibility of a 18 U.S.C. § 2241 charge carrying a sentence of thirty (30) years to life, and also avoided the possibility of multiple 18 U.S.C. § 2251 charges that would have increased his maximum possible sentence. (Doc. No. 83 at 103-108.) In addition, Attorney Ferro testified that the York County charges facing Petitioner were also impacted by his execution of the plea agreement, in that the York County prosecutor agreed that if Petitioner pled guilty in accordance with the plea agreement, he would ensure that any sentence on the York County charges would run concurrently to Petitioner's federal sentence. Specifically, Attorney Ferro testified as follows:

> Q. Now, at the time that [Petitioner] agreed to plead guilty the York County charges were still pending. Right?
>
> A. Correct.
>
> Q. Had you obtained any sort of agreement from the York County ADA about what would be done with those charges?

A.      I did.

Q.      What was that agreement?

A.      He agreed to me that if [Petitioner] entered into the plea agreement as proposed by the federal government and was ultimately sentenced in accordance with that agreement, that he would run any county charge concurrent with the federal sentence.

(Doc. No. 83 at 108-109.)  The Court notes that the Government introduced into evidence its Exhibit 13, which is a letter from Attorney Ferro to Petitioner indicating that the York County charges pending against him were ultimately dismissed when the York County Court of Common Pleas granted the Commonwealth's nolle pros motion.  (Id. at 127; Doc. No. 82-11.) Under such circumstances, it appears clear to the Court that Petitioner received potentially significant benefits from his execution of the plea agreement which contained the appeal waiver.

Given these considerations supported by the record, the Court concludes that Attorney Ferro's recommendation of the plea agreement (containing the appeal waiver) falls within the bounds of reasonable representation, and accordingly, that Petitioner has not demonstrated an entitlement to relief on his claim of ineffective assistance for failure to negotiate the appeal waiver, and that enforcing it does not result in a miscarriage of justice.  The Court turns to Petitioner's claim that the "cumulative prejudice of counsel's deficiencies resulted in ineffective assistance."  (Doc. No. 69 at 18.)

###### 5.      The Cumulative Prejudice of Counsel's Deficiencies Resulted in Ineffective Assistance

Based on the Court's conclusion as to the five grounds of alleged ineffective assistance of counsel discussed above, and in light of the Court's conclusion that Attorney Ferro's representation was not ineffective in any respect, the Court easily concludes that Petitioner's

argument that the "cumulative prejudice of counsel's deficiencies result in ineffective assistance" is without merit. The Court turns to Petitioner's sentencing guidelines challenge.

### B.     Petitioner's Sentencing Guidelines Challenge

Ground five of Petitioner's pro se motion and Amended motion argues that he was "erroneously sentenced based on the Improper Application of Enhancements under U.S.S.G. §§2G2.1(b)(4) and 3A1.3." (Doc. No. 69-1 at 15.) Specifically, Petitioner argues that "his sentence was improperly enhanced by four levels under U.S.S.G. §§2G2.1(b)(2)(B) for use of force and two levels under U.S.S.G. §3A1.3 for physical restraint." (Id.) First, he asserts that "the enhancements were improper because they were applied for acts alleged to have occurred during the 'hotel incident' which was uncharged conduct," and that the PSI Report "erroneously considered the 'hotel incident' to be offense conduct and Petitioner was prejudiced by such inclusion." (Id. at 15-16.) Second, Petitioner maintains that "the enhancements are not support[ed] by sufficient reliable evidence," and the Court's "finding to the contrary was not support[ed] b[y] a preponderance of the evidence." (Id. at 16.) Petitioner maintains that without those enhancements, the applicable guideline range would have been 210-262 months instead of life imprisonment.

Upon consideration of the arguments of the parties and the relevant authorities, the Court agrees with the Government and concludes that, under applicable Third Circuit precedent, such guideline errors alleged by Petitioner are not cognizable in connection with a Section 2255 motion. In United States v. Folk, 954 F.3d 597 (3d Cir. 2020), the Third Circuit held that an incorrect career offender enhancement under the advisory sentencing guidelines is "not cognizable under § 2255 because it is not a fundamental defect that inherently results in a complete miscarriage of justice." See id. at 604. In its decision, the Third Circuit reviewed the

four bases for a challenge to a federal sentence articulated in 28 U.S.C. § 2255(a), and found that a challenge to an enhancement under the advisory sentencing guidelines potentially met only the fourth basis for relief – that a sentence must be "otherwise subject" to collateral attack. See id. at 602 (citing 28 U.S.C. §2255(a)). The Third Circuit then reasoned that "[e]ven when based on an incorrect advisory career-offender enhancement, a sentence within the statutory maximum is lawful," and that "a lawful sentence is not a complete miscarriage of justice"; therefore, "an incorrect career-offender designation that results in a sentence within the statutory maximum is not a fundamental defect inherently resulting in a complete miscarriage of justice and cannot be cognizable under § 2255." See id. at 605. Accordingly, the Third Circuit held that "a nonconstitutional claim based on an incorrect career-offender enhancement under the advisory [g]uidelines is not cognizable under § 2255." See id. at 609. Consistent with that precedent, the Court agrees with the Government's position that Petitioner's challenge to the application of enhancements under the advisory sentencing guidelines, where Petitioner was ultimately sentenced within the statutory maximum, does not constitute a "fundamental defect inherently resulting in a complete miscarriage of justice," and therefore, is not cognizable in connection with his Section 2255 motion.[9]

### C. Certificate of Appealability

In proceedings brought under Section 2255, a petitioner cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued. A court may not issue a COA

---

[9] The Court acknowledges, as the Government notes, that in the course of asserting his argument regarding the application of enhancements, Petitioner maintains that Attorney Ferro "was ineffective for failing to object to the enhancements on the basis that they were not justified under the facts of the case," see (Doc. No. 69-1 at 15); however, while such an ineffective assistance claim may be cognizable on collateral review, the Court notes that Attorney Ferro did in fact object to the enhancements, see (Doc. Nos. 27, 38), and therefore, any claim of ineffective assistance on that basis is meritless.

unless "the applicant has made a substantial showing of the denial of a constitutional right."  <u>See</u>

28 U.S.C. § 2253(c)(2).  In other words, a COA should not issue unless "reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong."  <u>See</u> <u>Slack</u>

<u>v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Because the Court concludes that Petitioner's claims of

ineffective assistance are meritless, the Court finds that reasonable jurists would not disagree

with the Court's assessment of Petitioner's claims.  Accordingly, a COA will not issue in this

case.

**IV.**     **CONCLUSION**

For the foregoing reasons, the Court will deny Petitioner's § 2255 motion (Doc. Nos. 43,

69) and will not issue a COA.  An appropriate Order follows.